[No. 8226.]

## DENVER AND INTERURBAN RAILWAY COMPANY V. BEER.

1.  RAILWAY COMPANY—*Duty Towards Those on the Highway.*  One operating an electric car which approaches a highway crossing through a cut, obscuring, for a time, his view of the crossing, is under duty to keep a sharp lookout when emerging from the cut.  Seeing animals being driven upon the highway, and approaching the crossing, in time, by the exercise of ordinary care, to bring the car to a stop, and avoid injury to the animals, he is negligent if he fails to exercise this measure of care.  So, though he fails to perceive the danger, when by ordinary vigilance he might have seen it.  In either case the railway company is liable.  *Chicago Company v. Church,* 49 Colo. 582, distinguished.  (150, 154.)

2.  EVIDENCE—*Opinions.*  Where the question is as to whether, on a particular occasion, an electric railway car could have been brought to a stop before reaching a highway crossing, one who has on repeated occasions seen the cars operated upon the same railway brought to a stop, both in time of emergency, and other times, may testify to the result of his observations.

His testimony goes not to matter of opinion but to matter of fact.  (150, 151.)

Any one of sound mind and judgment may give an opinion as to the speed of a railway train which he has seen in movement.  The jury are to determine the weight to be accorded to his testimony.  (151.)

3.  TRIAL—*Questions for the Jury.*  Action for an injury to live stock, attributed to negligence in the operation of an electric car at a highway

crossing. Contributory negligence of the plaintiff alleged. Both the question of negligence and that of contributory negligence are for the jury. (151.)

4. —— *Jury May Refer to Their Own Experience,* in resolving the conflicts in testimony as to the distance in which an electric railway car, moving at a designated speed, may be brought to a stop. (153.)

*Error to Boulder County Court.* Hon. E. J. INGRAM, Judge.

Mr. E. E. WHITTED and Mr. T. M. STUART, JR., for plaintiff in error.

Mr. O. A. JOHNSON, for defendant in error.

SCOTT, J., delivered the opinion of the court.

The defendant in error recovered judgment against the plaintiff in error in the County Court of Boulder County, in the sum of $160.00 as damages for the alleged negligent killing of four cattle. The accident occurred near what is known as Louisville Junction, and at a point where the public highway crosses defendant's track.

The plaintiff below had employed James and William Burke to drive about seventy head of cattle from Denver to his farm in Boulder county. The Burkes were farmers and stockmen of experience, and the defendant's railroad track ran through at least one if not both farms, with a station named Burke, located on one of these farms. Both had so resided for many years, and were acquainted with the railroad and its operation, and in a general way, with its time schedule. The Burke station is located between Louisville Junction and Boulder.

The testimony shows that the Colorado and Southern railroad tracks cross the public highway at a point about 250 feet from the crossing of defendant's track, toward Denver.

Following the highway there is a down grade from the C. & S. crossing to where the highway crosses defendant's track, the latter being slightly elevated from a point on either side of the crossing. When the Burkes, driving the cattle, approached the C. & S. track, there was a freight

train standing thereon, and the cattle were stopped until this train had moved away, when they proceeded in the direction of the crossing of defendant's track. From this crossing and in the direction from which the electric car which collided with the cattle, was approaching, there is a deep cut, making it impossible to observe objects on the crossing until the car passes through the cut at a point estimated to be from 1,200 to 1,400 feet from the point where the public road crosses the track.

Prior to reaching defendant's track, the Burkes had separated the cattle into two bunches of about equal number. William, having charge of the leading bunch, was riding directly behind the cattle. James was in charge of the remainder of the cattle and immediately behind them. The two men were about 150 or 200 feet from each other. The cattle struck by the car were of those in advance, and in charge of William Burke. Both men testify that they hurried in an effort to get the cattle across defendant's track. They listened but did not hear the approaching car; James saw the car just as it was emerging from the cut and at once called to his brother who immediately rode upon the track and made an effort to separate the cattle and to drive them from the track on either side. As he rode upon the track he signalled the car repeatedly, and at the same time continued his effort to get the cattle off the track.

He says that so mounted upon his horse he remained on the track until the car was within about ten feet of him. There is a plain view of the crossing, and of the C. & S. crossing, and the roadway between them, at least from the point where the car emerged from the cut. So that at that time, the cattle being driven by both men must have been in plain view of the motorman. At the time the car emerged from the cut, according to the testimony of both men, some of the cattle were crossing the track, and the remainder were scattered back as far as the C. & S. crossing at least, and all being driven rapidly along the highway.

When we consider the fact of the deep cut which obscured the view of the motorman until he emerged therefrom, together with his knowledge of the highway crossing, both the track of the defendant and the C. & S. in such close proximity, and the comparatively short distance from the end of the cut to the highway crossing, there remains no question as to the duty of the motorman to keep a sharp lookout when emerging from the cut.

He must be presumed to have seen the apparent danger at that time. If he did not see such danger when he could have seen it, the defendant is liable to the same extent as though he had seen it. Then, if he did see the danger, or if by the exercise of ordinary care could have seen it, and if by the exercise of ordinary care he could have stopped his car in time to have avoided the accident, the defendant is liable.

The distance from the wagon road crossing to the near end of the cut is estimated by the number of poles carrying electric wire. The testimony shows that there were at least twelve of these and that they are at least one hundred feet apart, making the distance about 1200 feet.

The testimony of the plaintiff is that the car was running at about 30 miles an hour and was running slightly down grade.

The witness, William Burke, who was on the track testified that the car did not slacken its speed until within about 30 feet of the crossing. That he had seen the same kind of car running at the usual speed on defendant's line, stop within a distance of three or four poles, or three to four hundred feet. That this had occurred within his knowledge while the car was proceeding up grade and down grade; that it had occurred when he had flagged the car at the Burke station, which is only a flag station, and that it had been stopped within that distance at the time of an accident wherein a man was struck and killed, and at which time the witness was a passenger on the car.

Upon the theory that the latter testimony was not admissible, in that the witness was not competent to testify in that respect, the defendant moved a non-suit at the close of the plaintiff's testimony, which motion was by the court overruled and which ruling is assigned as error.

The witness was not called upon to testify as to a theory, or to offer an opinion as to the distance in which such a car at the usual rate of speed at which it was at the time running, could be stopped. His testimony was as to a fact; that it had been so stopped at different times, both in time of emergency, and in the absence of emergency.

The jury had a right to assume from this state of facts, in the absence of evidence to the contrary, that if the car had been stopped repeatedly within a given distance, and under similar conditions, it could have been stopped with proper effort in this case. As a rule theories and opinions must give way in the presence of undisputed facts to the contrary.

The testimony of the Burkes as to the speed of the train was competent. In *Nichols v. C. B. & Q. R. R. Co.,* 44 Colo. 501, 98 Pac. 808, it was said that any person of sound mind and judgment who has observed trains running, and has an opinion thereon, based upon seeing the train at the time in question, is a competent witness upon the speed, the jury being the judge of the weight to be attached to the testimony of the witness.

The two Burkes were experienced farmers and cattlemen, having been engaged in that business for more than thirty years in Boulder County, and had driven cattle over the same road, and the court cannot say from the testimony, which was the only testimony offered in the main case, that as a matter of law they were guilty of negligence or that even as a matter of fact did not under all the circumstances act with reasonable prudence and care. It was proper under the circumstances that the question of negligence and contributory negligence should have been submitted to the jury.

The motorman testified in substance as follows:

"I think the car was going about forty-five miles an hour; that is about the customary speed along there; at the crossings if there is nothing in sight we keep up the same rate of speed; I did not observe how far I could see the C. & S. crossing, but you can see that quite a long ways back; I did not see the cattle coming down over the C. & S. crossing toward the D. & I. crossing and the C. & S. crossing until I got within about a thousand feet of the crossing; the cattle were then huddled between the tracks as near as I can remember; if any of the cattle had crossed the track I didn't see them; I should judge there were forty-five or fifty cattle between the tracks; I did not see anyone on the D. & I. tracks until I was dangerously close to the road, about two or three hundred feet; I would swear I saw but one man; he was evidently trying to keep the stock back from the track; I don't remember seeing any signal at all, but I saw a man; there was a good deal of turning around there just at that time, cattle and one thing another; I couldn't truthfully say whether the man was on a horse or not; the first time I saw a man was when I was two or three hundred feet from the crossing; that was not the first time I saw the cattle."

It will be observed that the witness says he could see the C. & S. crossing a long way back. If this be true it is difficult to understand why he did not see the cattle being driven along the road at that point before the car entered the cut, and have thus apprehended the danger.

The motorman further testified substantially as follows:

"When I first discovered the cattle dangerously close, the first thing I did was to apply the emergency brakes and also the sand; I did this almost instantly when I saw the cattle; I was a thousand feet away when I applied emergency brakes and released sand; it was not possible for me to do anything more to stop the car in time to avoid the accident; I should say my car was moving at about forty-five miles an hour when I applied the air and emergency and released the

sand; when I ran into the stock I should say the car was running about six or eight miles an hour; the car moved about 150 feet beyond the crossing before stopping; the condition of the air brakes on the car was good; my air immediately took effect upon the wheels; there was nothing at all the matter with any of the air brake appliances; I have been a motorman since the 10th day of July, 1908; I have had experience in estimating and actual attempts in stopping one of the D. & I. cars; I would say that it would take at least twelve or fourteen hundred feet to stop one of these cars going at approximately forty miles an hour, down grade after the air had been placed in emergency and the sand released; I was keeping a vigilant lookout prior to this accident; I was looking as far as it was possible to see ahead along the track; I don't think it would have been possible for me to have seen any object on or near this crossing prior to the time that I did see it, it was impossible for me to have done anything to stop the car other than what I did."

His testimony as to the distance at which one of defendant's cars may be stopped, is corroborated by another employe of the company. So that there appears in the record, witnesses testifying from personal observation upon this point. Those for the plaintiff fixing the distance at from three to four hundred feet, and those for the defendant fixing the distance at from 1200 to 1400 feet. This matter became an important factor in the case and it was a question of fact clearly for the jury to determine.

Twelve hundred feet is but little short of a quarter of a mile, and fourteen hundred feet is a little more than a quarter of a mile.

To say that the defendant cannot stop one of its electric passenger cars running at its usual speed in an emergency, in less than a quarter of a mile, is somewhat startling to the average mind; and the jury had the right to weigh this conflicting testimony in the light of their experience.

If the testimony of defendant be true, as to the distance

in which a car may be stopped, it suggests the question of negligence upon the part of defendant, in fixing its schedule at forty-five miles an hour in running through a cut, opening so close to a public crossing that its cars may not be stopped in an emergency before reaching the crossing.

The defendant offered testimony to show that such was its schedule at the particular point. The court permitted the jury to examine the premises and the locality where the accident occurred, and they were thus able to the better weigh the testimony as to distance and other physical conditions.

Counsel for defendant contend that the motorman or engineer of a train is not under duty to even check his speed merely because cattle are seen near a highway crossing, and cite *Chicago Co. v. Church*, 49 Colo. 582, 114 Pac. 299.

But the circumstances of that case were entirely different from the case at bar and the court limited the rule to the facts stated, and qualified it by the exception: "Unless the animals are already in danger or are likely to presently go upon the crossing, and the engineer sees, or by reasonable circumspection could see, such probability of danger, in time to avoid doing injury to the animals."

There the cattle had simply wandered away from an enclosure. Here, the cattle were being driven along the highway, strung out for a distance of from two to five hundred feet, approaching the track at the crossing, with the plain purpose of crossing the track, all of which might have been easily observed by one who could or did see them.

There the court said:

"So far as plaintiff's evidence indicates, the cattle may have been standing perfectly still, facing a direction opposite from the track, in close proximity thereto, yet in no apparent danger, and to have suddenly come upon the crossing at a time when it was impossible for the defendant, exercising the greatest care, to avoid the collision."

The doctrine of that case clearly supports the view ex-

pressed in the present one. In this case the court very properly instructed the jury upon that point as follows:

"You are instructed that the defendant is under no duty to stop its cars merely because animals are near its tracks, even though at a highway crossing, and the fact that stock is standing near such crossing does not require the motorman to check the speed of his car unless there is something to indicate that the stock may go upon the track. Therefore, unless you find from a preponderance of the evidence that plaintiff's stock was upon the track or so close thereto that it would presently likely be on said track and in a position of danger, and unless you further find that the motorman had notice thereof or by the exercise of reasonable diligence would have been advised thereof for a sufficient length of time before the accident to have avoided it by the exercise of reasonable care, then the plaintiff cannot recover and your verdict shall be for the defendant."

The judgment is affirmed.

GABBERT, C. J. and GARRIGUES, J., concur.

Decided July 6, A. D. 1915. Rehearing denied November 1, A. D. 1915.